UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

| | |
|---|---|
| COLONY BEACH AND TENNIS CLUB, INC. | Case No. 8:13-bk-00348-KRM |
| COLONY BEACH, INC. | Case No. 8:13-bk-00350-KRM |
| RESORTS MANAGEMENT, INC. | Case No. 8:13-bk-00354-KRM |
| COLONY BEACH & TENNIS CLUB, LTD. | Case No. 8:09-bk-22611-KRM |
| COLONY BEACH & TENNIS CLUB ASSOCIATION, INC. | Case No. 8:08-bk-16972-KRM |

        Debtors.
_____/

COLONY BEACH & TENNIS CLUB
ASSOCIATION, INC.,

        Plaintiff

vs.                                                              Adv. Proc. No 8:13-ap-196-KRM

COLONY LENDER, LLC

        Defendant,
_____/

MEMORANDUM OPINION REGARDING
CONTESTED CONFIRMATION HEARING, PROPOSED "GLOBAL"
SETTLEMENT AGREEMENT AND RELATED ADVERSARY PROCEEEDING

INTRODUCTION

        The Court has before it contested matters in five bankruptcy cases, including:  (1) the

contested confirmation of the Joint Plan filed by Resorts Management, Inc. ("RMI"), Colony

Beach and Tennis Club, Inc. ("CBTC"), and Colony Beach, Inc. ("CBI");[1] (2) a "global" Settlement Agreement and Mutual Release ("Settlement Agreement") among these same three Chapter 11 debtors, the Chapter 7 trustee for Colony Beach and Tennis Club, Ltd. (the "Partnership"), Dr. Murray Klauber, the developer of the Resort, his daughter, Katherine Moulton, and the Colony Beach and Tennis Club Condominium Association (the "Association");[2] and (3) a motion for summary judgment in an adversary proceeding ("AP 196") in the Partnership's Chapter 7 case seeking to disallow a secured claim acquired in 2010 by Colony Lender, LLC ("Colony Lender").[3]

For more than 30 years, the 18-acre Colony Beach & Tennis Club Resort on Longboat Key was a world famous destination for Gulf Coast and tennis vacations.  In the last ten years, however, its physical condition has deteriorated, while disputes among its divided owners led to its closing in 2010.

Ordinarily, debtors like RMI, CBTC and CBI would find it impossible to survive in a Chapter 11, much less achieve confirmation of a Chapter 11 plan.  They have no active businesses, no income, no employees, and no equity in the real property they own – an undivided 80% interest (CBTC, 45%; CBI, 35%) as tenants-in-common in the 3-acre "Rec. Lease Property" (as described below).  Their Joint Plan is not supported by the principal secured creditor, Colony Lender, which is owed nearly $14 million.  The Joint Plan is premised on either a third-party

---

[1]  On February 27, 2013, these cases cases were administratively consolidated.  All document filing citations will be to the consolidated docket.  8:13-bk-348-KRM.  The Amended Chapter 11 Plan of Reorganization, the third plan filed by the debtors, was filed on October 21, 2013.  Chapter 11 Case, Doc. No. 172.

[2]  The Settlement Agreement was filed on September 26, 2013.  Chapter 11 Case, Doc. No. 149.

[3]  Adv. Pro. No. 8:13-ap-196-KRM.

purchaser coming forward or funding over five years by the Association, which must obtain a 75% Unit Owners' vote to authorize special assessments.

The three Chapter 11 debtors, however, are at the center of a struggle for control of the 18-acre Resort property. Fifteen acres are controlled, for the time being, by the Unit Owners and the Association. Colony Lender owns outright a 15% undivided interest in the Rec. Lease Property and is pushing to acquire the debtors' 80% interest through a foreclosure sale.

The Joint Plan proposed by debtors RMI, CBTC and CBI is dependent on approval of the Settlement Agreement. Together, the Joint Plan and the Settlement Agreement would: cause debtors CBTC and CBI to convey to the Association their respective 45% and 35% undivided interests in the "Rec. Lease Property," on which interests Colony Lender holds a mortgage, and compel Colony Lender to transfer its own 15% undivided interest in the Rec. Lease Property to the Association; resolve pending disputes among the Association and the Partnership, RMI, CBTC and CBI, and Dr. Klauber and Ms. Moulton; and obligate the Association to pay about $5.3 million to the Partnership trustee, the Chapter 11 debtors and Dr. Klauber; and obligate the Association to propose a Plan of Termination of the condominium, including a judicial valuation of the entire 18 acres, and then pay (or cause a designated third party to pay) Colony Lender and the other co-owners amounts equal to their proportionate interests in the Rec. Lease Property.

If Colony Lender can acquire 100% of the Rec. Lease Property, it can assert, or threaten to assert, rent collection claims, under Article 4.4 of the Declaration to achieve ownership of the Unit Owners' interests in the other 15 acres.[4] Likewise, if the Association acquires 100% of the Rec. Lease Property, as is proposed through the Joint Plan and Settlement Agreement, the issue

---

[4] The validity and effect of Article 4.4 of the Declaration is not before the Court. Nevertheless, it is a reasonable inference that the mere threat of enforcement of such rights against Unit Owners would induce them to relinquish their interests in exchange for releases.

3

of the personal liability of Unit Owners for rents will likely disappear.  Appreciation of this dynamic is essential to understanding the parties' positions in these cases.

Confirmation of the Joint Plan and approval of the Settlement Agreement are opposed by Colony Lender and the Field Trust.  For the reasons set forth below, the Court will deny confirmation of the Joint Plan, deny approval of the Settlement Agreement and grant partial summary judgment in AP 196 in favor of the Association and Colony Lender.[5]

## THE RESORT, DIVIDED OWNERSHIP AND THE PENDING DISPUTES

The Colony Resort was formed in 1973 on 18 acres on the Gulf of Mexico in the Town of Longboat Key.  The land was acquired from Mr. and Mrs. Field who had owned the land since 1952.  Dr. Klauber formed the Partnership to operate the Resort, with debtor RMI as its general partner.

About 15 acres were put into a condominium, consisting of 232 guest units, 7 accessory units (Units "A"–"G") and common area.  The Resort was capitalized by the sale of the guest units to the public.  The Unit Owners hold legal title to their units, but they were required to contribute them to the Resort for 11 months a year; in return, they were entitled to one month's free use of their unit, subject to reservation policies.  The Unit Owners are members of the Association.  Approximately 59 of the guest units are now owned by the Association's past president, Mr. Andy Adams and members of his family.

The remaining 3 acres of the Resort -- a swimming pool, 12 tennis courts, and certain ancillary buildings -- were kept out of the condominium.  This property, together with the "spa"

---

[5] This Memorandum Opinion supplements a bench ruling announced on the record in court on February 26, 2014.

and "clubhouse" units within the condominium, were leased to the Association for 99 years and

are known collectively as the "Rec. Lease Property."

The divided ownership of the entire 18 acres can be summarized as follows:

| | |
|---|---|
| 232 Condo Units and Common Area | Unit Owners; 59 of which are owned by Mr. Adams and affiliates; 2 are owned by Scaz, LLC, a Colony Lender affiliate; 2 units are owned by the Association by foreclosure. |
| Restaurant and Bar (Condominium Unit A) | Owned by debtor CBI, subject to Colony Lender's mortgage. |
| Men's Shop & Gift Shop (Condominium Units F & G) | Owned by debtor CBI, subject to Colony Lender's mortgage. |
| Unit 501 (Penthouse) | Owned by Dr. Klauber, subject to Colony Lender's mortgage. |
| Pro Shop and Food/Beverage Unit (Condominium Units C & E) | Owned by debtor CBI, subject to lien for unpaid taxes but not subject to any mortgage. |
| Spa and Clubhouse* (Condominium Units B & D) | Owned as tenants in common by CBTC (45%) and CBI (35%), both subject to Colony Lender's mortgage; Colony Lender (15%, from the Field Trust); and Mr. Adams' BreakPointe LLC (5%, from the William Merrill Trust). |
| Rec Facilities* (pool, tennis courts Parcel B buildings) | Owned as tenants in common by CBTC (45%) and CBI (35%), both subject to Colony Lender's mortgage; Colony Lender (15%, from the Field Trust); and Mr. Adams' BreakPointe LLC (5%, from the William Merrill Trust). |
| *the "Rec. Lease Property" | |

The Restoration Damages Dispute

Beginning in 2005, the Partnership sought to finance a major restoration of the Resort by having the Association specially assess Unit Owners in excess of $12 million.  The Unit Owners rejected that proposal, twice.  In May 2007, the Partnership sued the Association in state court for damages and requested injunctive relief to compel the special assessment.  In response, the Association filed a Chapter 11 petition on October 29, 2008, and then removed to this Court the Partnership's lawsuit, which became an adversary proceeding ("AP 567").[6]  In November 2009, after an eight-day trial, this Court entered judgment in favor of the Association on all of the Partnership's claims and denied the Association's counterclaims as moot.

On July 27, 2011, the District Court reversed and remanded AP 567 with instructions.  On October 24, 2012, this Court submitted its Report and Recommendation to the District Court that a judgment in favor of the Partnership be entered against the Association in the amount of $23,146,503.25.[7]  Entry of judgment remains pending because RMI, one of the parties in AP 567, filed a Chapter 11 petition on January 11, 2013, staying further proceedings.

The Rec. Lease Dispute

When the Colony Resort was formed, the Association was required to enter into a 99-year lease (the "Rec. Lease") of the Rec. Lease Property.  The Association rejected the Rec. Lease in its Chapter 11 case, effective November 10, 2008.[8]  The Lessors then filed lease rejection damages claims in the Association's Chapter 11 case (Claims Nos. 16, 19, 20 and 21, the "Rejection Damages Claims").

---

[6]  Adv. Pro. No. 8:08-ap-00567-KRM.

[7]  AP 567, Doc. No. 170.

[8]  Association Chapter 11 Case, Doc. No. 21.  This Court's order was affirmed by the District Court in March 2010.

The Association objected to the four Rejection Damages Claims and filed a lawsuit for a declaratory judgment that the Lease was unconscionable and unenforceable. That lawsuit was removed to this Court and became an adversary proceeding ("AP 568").[9] In January 2010, this Court entered a judgment in favor of the Association and disallowing all of the Lessors' Rejection Damages Claims. The District Court reversed and remanded AP 568. The Field Trust did not appeal the judgment; but, the District Court instructed that all of the Rejection Damages Claims be allowed. On October 24, 2012, this Court made a Report and Recommendation to the District Court that the four claims should be allowed in the aggregate amount of $2,223,391.70.[10] Entry of judgment remains pending because Lessors CBTC and CBI filed Chapter 11 petitions on January 11, 2013, staying further proceedings.

The Association's Chapter 11

By orders dated September 25, 2009 and October 26, 2009, this Court confirmed the Association's Chapter 11 plan, which requires the Association to pay allowed claims of the Partnership, CBTC, CBI, RMI, the Lessors, and Dr. Klauber, in quarterly installments over 5 years, with 6% interest, after exhaustion of all of the Association's appeal rights in AP 567 and AP 568.[11]

On November 12, 2009, this Court entered an order denying the Partnership's administrative expense claim for $261,459 in the Association's case.[12] Although the Bankruptcy Court's ruling was not appealed, the Partnership's trustee filed a motion to vacate the denial of

---

[9]  Adv. Pro. No. 8:08-ap-00568-KRM.

[10]  AP 568, Doc. No.152.

[11]  On July 30, 2010, the District Court affirmed the Confirmation Orders.

[12]  The amount of this claim, although denied administrative expense status, was included in the unsecured damages claim in this Court's Report and Recommendation to the District Court in AP 567.

the administrative expense claim.  On October 24, 2012, the Bankruptcy Court denied the motion

to vacate.  The trustee's appeal remains pending.

In a related matter occurring in state court, Dr. Klauber is currently defending claims

made by the Association for unpaid condominium fees assessed against his units in the

condominium.  Dr. Klauber has asserted counterclaims against the Association in the foreclosure

action.

The Partnership's Bankruptcy Case

On October 5, 2009, the Partnership filed its own Chapter 11 petition after having closed

the Resort on September 23, 2009.[13]  After some months, the Resort reopened with less than half

of the guest units available.  In turn, the Partnership was unable to provide accommodations to

Unit Owners as required under the Declaration of Condominium.  On August 13, 2010, this

Court entered final judgment in an adversary proceeding filed in the Partnership's case, ejecting

the Partnership from its use and possession of the guest units and common area.[14]  That same

month, the Partnership's Chapter 11 case was converted to Chapter 7.  William Maloney was

appointed trustee.[15]  The Resort ceased operating and has remained closed ever since.

The Association and Unit Owners have filed claims in the Chapter 7 case for damages

totaling more than $15 million.  Other general unsecured claims total about $1.25 million.

---

[13]  Case No. 8:09-bk-22611-KRM.

[14]  Doc. No. 23 in Adv. Pro. No. 8:10-ap-0242.  Two years later, the Partnership's trustee filed a motion to vacate
the final judgment of ejectment, which this Court denied on October 24, 2012.  AP 242, Doc. No. 54.  That order
was not appealed.

[15]  The Court held several days of hearings in April and May of 2010, on the Association's motion to convert the
Partnership's Chapter 11 case.  (Doc. No. 184).  The Court concluded that the record supported conversion to
Chapter 7, but ruled that a Chapter 11 trustee should be appointed to pursue a global resolution of the disputes (Doc.
No. 301).  When the trustee reported that that effort had failed, the case was converted.

Colony Lender's Claims

In March 2010, Colony Lender paid $4.5 million, through an affiliate, to Bank of America to acquire outstanding loans to (and claims against) CBTC, CBI, the Partnership and other Klauber entities.[16] Dr. Klauber and RMI are guarantors of these loans.

As a result, Colony Lender acquired Bank of America's mortgage on the 80% undivided interests of CBTC and CBI in the Rec. Lease Property.  In March, 2010, Colony Lender filed an amendment to Bank of America's October 13, 2005 financing statement, but did not continue the financing statement beyond its original five-year effectiveness. [17] Thus, its financing statement lapsed on October 13, 2010.

In 2011, Colony Lender acquired an undivided 15% interest in the Rec. Lease Property from the Field Trust; the Field Trust, retained, however, its proof of claim for lease rejection damages (Claim No. 20) in the Association's Chapter 11 case.  Mrs. Field has declined to join the Settlement Agreement.  Mrs. Field became a shareholder of Colony Lender in 2011 and is aligned with Colony Lender in all of the matters before the Court.

Colony Lender's stated purpose in 2010 was to partner with a hedge fund, York Capital, to acquire and redevelop the Resort.  That effort ended in April or May of 2010 when York Capital withdrew from further discussions with the Association.

Colony Lender also succeeded to the pending state court foreclosure action that Bank of America had previously filed in 2009.[18]  On August 27, 2013, Colony Lender obtained a

---

[16]   Confirmation hearing, Debtors' Exh. 41.

[17]   § 679.515(1) (2013), Fla. Stat.

[18]   In April 2009, Bank of America filed a complaint in state court against CBI, the Partnership, Dr. Klauber, RMI, CBTC, other Klauber entities (Colony Investors, Inc., Colony Special Services, Inc., and Le Tennique, Inc.) to

foreclosure judgment in the amounts of $14,357,433 against the debtors and $5,719,248.90 against the Partnership.[19]

Colony Lender is a secured creditor in the CBTC and CBI cases by reason of its mortgage lien on their interests in the Rec. Lease Property. Colony Lender's appraisal, dated July 22, 2013, concludes that the 80% interests in the Rec Lease Property are worth $10,630,000 on an "as is" basis.[20] The only evidence of value offered by CBTC and CBI is the County's combined tax assessed value of $6,204,600.[21]

In recent years, the fractional interests in the Rec. Lease Property have themselves been traded. Colony Lender bought the Field Trust's 15% interest in 2011 for $766,350 ($51,090 per each 1%). BreakPointe acquired its 5% interest from the Merrill Trust for $350,000 ($70,000 per each 1%). These sales would suggest a value of the debtors' combined 80% interest at between $4.1 million and $5.6 million. By any of these measures, it is evident that CBTC and CBI have no equity in the Rec. Lease Property.

Colony Lender has frequently referred to the leverage inherent to owning the Rec. Lease Property, specifically a possible claim under Article 4.4 of the Declaration of Condominium against the Unit Owners for Rec. Lease rents. The issue of whether individual Unit Owners

foreclose its mortgage on the real estate interests of CBI, CBTC and Dr. Klauber in the Rec. Lease Property and in Accessory Units A, F, and G and the Penthouse Unit 501.

[19] Enforcement of the foreclosure judgment, by sale of the 80% interest in the Rec. Facilities Property, was stayed by the Chapter 11 filings by CBTC and CBI. The stay was modified on October 24, 2013, to allow the foreclosure sale of the 80% interests to proceed. Chapter 11 Case, Doc. No. 179. On December 5, 2013, this Court entered an order vacating the prior order and re-imposed the stay pending full consideration of the Joint Plan. Chapter 11 Case, Doc. No. 225. Colony Lender has filed a notice of appeal and a motion for leave to take an interlocutory appeal, Chapter 11 Case, Doc. Nos. 234 and 235.

[20] Confirmation hearing, Colony Lender Exh. 2. The appraisal attributes an additional $680,000 to Penthouse Unit 501 owned by Dr. Klauber.

[21] The debtors filed a Motion to Value Collateral of Colony Lender on June 13, 2013. Chapter 11 Case, Doc. No. 116.

remain liable, or whether their units are subject to liens, is not before the Court.[22]  The mere

threat, however, of asserting rent claims against Unit Owners would give the 100% owner of the

Rec. Lease Property tremendous leverage in seeking to acquire the 15 acres of condominium

property.

The Klauber Entities Chapter 11 Cases

CBI, CBTC and RMI (collectively, the "Klauber Entities") filed their petitions for relief

under Chapter 11 on January 11, 2013.  The following is a snapshot of each case:

> The CBTC estate includes a 45% interest as tenant-in-common in the Rec.
> Lease Property and a pending Rejection Damages Claim (Claim No. 21)
> against the Association.

> The CBI estate includes:  (a) a 100% interest in Condominium Unit A (the
> Bar and Restaurant); (b) a 100% interest in Condominium Units F and G,
> located next to the Restaurant, which formerly housed the Men's Shop and
> Gift Shop; (c) a 35% interest as tenant-in-common in the Rec. Lease
> Property; a 100% interest in Condominium Units C and E in the midrise
> building known as the Pro Shop and the Food and Beverage Service Unit
> subject only to liens for ad valorem taxes; and a pending Rejection Damages
> Claim (Claim No. 16) against the Association.

> RMI acted solely as the corporate general partner of the Partnership and
> does not own any assets; RMI is a guarantor of the obligations owed to
> Colony Lender.

> Colony Lender has asserted identical claims in all three cases in the amount of its

foreclosure judgment, $13,612,775.71, $6,396,220.00 of which is said to be secured by a lien on

all assets, except Units C and E.[23]  On February 21, 2013, CBTC, CBI and RMI filed an

adversary proceeding challenging the liens asserted by Colony Lender on personal property

---

[22]  The Association's claim to adjudicate this issue on behalf of the Unit Owners in AP 568 (Count 2) was dismissed
by this Court because it was a dispute by non-debtors against non-debtors.  AP 568, Doc. No. 29.

[23]  Claim No. 3-2 in the CBTC case, Claim No. 1-2 in the CBI case, and  Claim No. 1-2 in the RMI case.

because of its lapsed financing statement ("AP 151").[24]  On December 5, 2013, this Court ruled

that the CBTC and CBI Rejection Damages Claims are personal property that is not encumbered

by Colony Lender's lien, which was unperfected on the petition date.  Thus, Colony Lender's

security interest is avoidable by the bankruptcy estate under 11 U.S.C. §544(a).[25]

## SUMMARY JUDGMENT IN AP 196

The Partnership owns no real estate.  Its principal asset is a possible recovery in the

pending AP 567.  In December 2009, Bank of America timely filed a proof of claim in the

Partnership's case (Claim No. 136) in the amount of $3,742,080.25, asserting that it is secured by

a lien on all assets of the Partnership.  On October 29, 2012, Colony Lender filed an "amended"

Claim No. 136 in the amount of $13,383,708.40, also asserting that it is secured by a lien on

assets of the Partnership.

On March 7, 2013, the Association filed AP 196 to determine the validity and extent of

Colony Lender's secured claim in the Partnership Chapter 7.[26]  The Association contends that the

Partnership was only authorized to borrow for the limited purposes stated in Section 7.2 of its

Certificate and Agreement of Limited Partnership; that the original loans and refinancing from

Huntington Bank were outside the Partnership's express authority to borrow; that Huntington

Bank (and, later, Bank of America) knew of this limitation; that Colony Lender advanced no new

funds, but only succeeded to the banks' position; that Colony Lender's amendment to increase

the amount of its claim is time-barred, after the passing of  two claims bar dates (the first in the

---

[24]  Adv. Pro. No. 8:13-ap-151-KRM.

[25]  AP 151, Doc. No. 30.

[26]  Adv. Pro. No. 8:13-ap-196-KRM.  As a creditor and party-in-interest in the Partnership Chapter 7, the
Association was granted derivative standing to challenge the extent, validity and priority of Colony Lender's liens.
Partnership Case, Doc. No. 566.

Partnership's Chapter 11 case; the second after conversion to Chapter 7); and that by operation of 11 U.S.C. § 544(a), the post-petition lapse of Colony Lender's financing statement renders its claim unsecured.

The Court previously made a bench ruling that Colony Lender's amended claim is time-barred. For the reasons stated on the record, Colony Lender will be limited to a claim of no more than the amount of Bank of America's timely filed claim, $3,742,080.25. The parties later submitted briefs on the issue of whether the post-petition lapse of Colony Lender's financing statement had the effect of making its security interest ineffective against the Partnership trustee, and therefore unsecured.[27]

The Association argues that that the change in Article 9 of the Uniform Commercial Code in 2001 -- that removed the provision that tolled the five-year period of a financing statement's effectiveness during a pending bankruptcy case -- means that, upon lapse of perfection, Colony Lender's claim becomes *unsecured* and the collateral is free of the lien.[28] Colony Lender counters that this Court should apply a general tenet of bankruptcy, the so-called

---

[27]  The parties' post-hearing briefs are Doc. Nos. 34 and 35. The remaining challenges to the validity of Colony Lender's claim involve genuine issues of material fact (e.g., what the original and successor lenders "knew" about the limitations on the Partnership's authority to borrow).

[28]  Section 362(b)(3) the Bankruptcy Code excepts from the automatic stay the filing of a continuation statement. *In re Ibous*, 2009 WL 6430982 at *3 (Bankr. M.D. Fla. 2009). ("It is clear Section 362(b)(3) operates to permit a secured creditor to file a continuation statement despite the automatic stay."). Before 2001, the duration of a security interest was tolled during an insolvency proceeding, by UCC § 9-403(2), which then provided that "if a security interest perfected by filing exists at the time insolvency proceedings are commenced by or against the debtor, the security interest remains perfected until termination of the insolvency proceedings and thereafter for a period of 60 days or until expiration of the 5-year period, whichever occurs later." With the enactment of Revised Article 9 in 2001, Section 9-515 (as codified in Fla. Stat. § 679.515) removed the bankruptcy tolling provision in the prior law.

"freeze rule," to hold that the priority of lines is frozen as of the petition date.[29]  There is no

controlling decision in the Eleventh Circuit on this issue.

The Court announced, at a bench ruling on February 26, 2014, its preliminary decision

that the 2001 changes in the UCC Article 9 would render Colony Lender's claim to be unsecured

upon lapse of the financing statement.  In preparing this memorandum opinion, however, the

Court has been compelled to reconsider its initial view.

The effect of a lapsed financing statement is expressly addressed in Section 679.515(3),

Florida Statutes, which provides:

> "Upon lapse, a financing statement ceases to be effective and any security
> interest or agricultural lien that was perfected by the financing statement
> becomes unperfected, unless the security interest is perfected without filing.
> If the security interest or agricultural lien becomes unperfected upon lapse,
> it is deemed never to have been perfected as against a purchaser of the
> collateral for value."

There is a seductive appeal to the notion that the lapse of a financing statement and the

loss of perfection has the dire consequence of extinguishing the lien.  A more precise

examination of the statutory language, however, leads to the ironical conclusion reached by

Bankruptcy Judge Robert Mayer:  *"When is a financing statement that is no longer effective, still

effective?  When it lapses, of course!"*[30]

The first sentence of Section 9-515(3) has a prospective effect -- the financing statement,

and thus perfection, ceases to be effective after the lapse.  The second sentence has a retroactive

effect -- the financing statement is deemed never to have been effective against a purchaser of

---

[29]  *See, In re Wilkinson,* 2012 WL 1192780 at *4 (Bankr. N.D.N.Y., April 10, 2012).  *See also In re Bond Enterprises, Inc.,* 54 B.R. 366, 369 (Bankr. D. N.M. 1985) (holding that Section 9-403 of the 1962 version of the UCC preserved a lien against lapse during the pendency of a bankruptcy case.  "[T]he critical time for determining the respective rights of a debtor and its creditors is the date of the filing of a petition in bankruptcy.").

[30]  Emphasis added.  *Highland Construction Mgt. Services LP v. Wells Fargo N.A., (In re Highland Construction Mgt. Services LP)* 497 B.R. 829, 831 (Bankr. E.D. Va. 2013).

the collateral for value.  Nowhere in the UCC is there a provision stating that upon lapse, the lien is extinguished.

The cessation of perfection is a priorities issue -- meaning that the security interest becomes vulnerable, from then on, to a loss of priority.  As long as the bankruptcy case is pending, however, the automatic stay of 11 U.S.C. §362(a) will prevent holders of unperfected security interests and general unsecured creditors from filing or recording anything to jump ahead in priority.

In a pending bankruptcy case, a perfected secured claim on the petition date can later become "unsecured" in one of four ways:  (1) if the underlying claim is later invalidated, the lien securing it can be avoided by 11 U.S.C. § 506(d); (2) if the value of the collateral, as of the petition date, is determined to be less than the amount of the underlying claim, then the secured claim can be "stripped down" or completely "stripped off" by 11 U.S.C § 506(a) and an unsecured claim for the deficiency; (3) if the lien impairs an exemption a secured claim may be "avoided" by an individual debtor, by 11 U.S.C. § 522(f); or (4) a lien may be "avoided" by a bankruptcy trustee (or a debtor-in-possession armed with a trustee's powers), by the provisions of 11 U.S.C. § 544-549.

It may prove to be, as the Association has alleged in AP 196, that Colony Lender's underlying claim against the Partnership is invalid and that 11 U.S.C. § 506(d) can then be employed to extinguish (avoid) the lien.  At this stage, however, the contention is only that Colony Lender's security interest is avoidable under 11 U.S.C. § 544(a).  Under that provision, a trustee in bankruptcy acquires, by operation of law, the status of a judicial lien creditor as of the

petition date.[31]  This is the so-called "strong-arm" provision which enables a bankruptcy trustee to have priority over liens that are unperfected on the petition date.[32]

In 2012, a North Carolina bankruptcy court adopted the view urged by the Association and held that the post-petition lapse of a financing statement permitted the debtor-in-possession, having the strong-arm powers of a trustee under 11 U.S.C. § 544(a)(1), to take priority over a creditor that had a properly perfected security interest on the petition date.[33]  Like the Association here, the bankruptcy court reasoned that, since the five-year period of effectiveness of a financing statement is no longer tolled during a bankruptcy case and secured creditors are not stayed from filing a continuation statement, a creditor who fails to continue the financing statement loses "secured status" upon a post-petition lapse.[34]

But, that ruling was reversed.[35]  The District Court, employed a thorough analysis of both North Carolina's UCC Section 9-515(c) and the overlaying provisions of the Bankruptcy Code, reasoning that:

> "Upon lapse of a financing statement, Section 25-9-515(c) provides that the security interest is deemed never to have been perfected as against a purchaser of the collateral for value . . . but does not provide the same modification as to judicial lien creditors."[36]

---

[31]  The trustee also acquires the status of a bona fide purchaser of real property, a status which is outside the scope of § 679.515(3), Fla. Stat.

[32]  Section 679.3171(1), Fla. Stat.

[33]  *In re Miller Bros Lumber Co.*, 2012 WL 1601316 (Bankr. M.D. N.C., May 8, 2012).

[34]  *Id*. at *2.

[35]  *In re Miller Bros. Lumber Co.,* 2013 WL 5755052 (M.D. N.C., Oct. 23, 2013).

[36]  *Id*. at *6.

16

> "Although American Bank did lose its perfected status, N.C. Gen. Stat.
> §25-9-317(a)(2) provides priority to a judicial lien creditor only if it
> acquires its interest prior to perfection of the security interest. . . ."[37]

Consequently, the debtor-in-possession obtained no benefit from the "deemed never to have been perfected" language in UCC Section 9-515(c), the cognate of Florida's Section 9-515(3).  Thus, "even upon lapse, [the creditor] retains priority over the DIP's judicial lien."[38]

More recently, the bankruptcy court in Virginia employed a similarly careful analysis to reach the same conclusion:  a debtor-in-possession cannot avoid the lien of a secured creditor whose security interest was perfected on the petition date, but whose financing statement lapsed post-petition:[39]

> "The debtor cannot avoid the secured creditor's security interest under
> §544(a) because as of the date of the filing of the petition, his lien was
> properly perfected.  A §544(a) avoidance action looks to that point in time,
> not a later lapse."

The lapse of a *financing statement* does not mean that the creditor's *security interest* is extinguished.  It means only that the security interest becomes vulnerable to later–perfected security interests and judicial liens, which are not going to arise as long as the automatic stay is in effect.

Accordingly, the Court is compelled to conclude that Colony Lender's secured claim against the property of the Partnership's estate did not become "unsecured" upon the post-petition lapse of its financing statement.  The claim remains subject, however, to the Association's objection contesting its validity.

---

[37] *Id.*

[38] *Id* at *7.

[39] *In re Highland Construction Management Services, LP*, 497 B.R. 829 (Bankr. E.D. Va. 2013).  *See also*, *Mostoller v. CitiCapital Commercial Corp. (In re Stetson & Assoc., Inc.)*, 330 B.R. 613 (Bankr. E.D. Tenn. 2005).

THE PLAN AND SETTLEMENT AGREEMENT

The Joint Plan provides a skeletal framework for distributions to creditors, including the discharge and release of the debtors and certain non-debtors (the "Released Parties," as they are identified in the Settlement Agreement).  The Joint Plan is not self-executing, but is to be implemented by the transactions contemplated by the Settlement Agreement.

Together, the Joint Plan and Settlement Agreement propose to settle all disputes surrounding the Resort, except for those involving Colony Lender and the Field Trust.  The debtors emphasize the lengthy and difficult effort required to achieve the agreement among the settling parties.[40]  All classes of creditors, except Colony Lender in Class 1, voted to accept the Joint Plan.

On the eve of the confirmation hearing, the Association conducted a duly noticed Unit Owners meeting to consider approval of the Settlement Agreement.[41]  Unit Owners were advised that they would be specially assessed up to $25,000 per unit for the initial settlement payments of up to $5.3 million.[42]  A controversy arose, however, when Mr. Adams submitted amended proxies purporting to make his 59 affirmative votes subject to conditions, which were not fully satisfied.  Nevertheless, after communicating with Mr. Adams and his attorney, the Association

---

[40]  The Joint Plan also includes the following regarding the "Klauber Family Consulting Agreement:"

> "The Global Compromise memorializes, as an integral and permanent aspect of the Resort, an appropriate recognition of the contribution of the Klauber Family to the development and vision of the Resort and the Town of Longboat Key community.  The Global Compromise includes a consulting agreement with the Klauber Family to insure that a meaningful and continued relationship will exist with the Klauber Family in any rebuild or restoration of the Resort.  As consideration for any such consulting agreement, the Klabuer Family will fully support and assist with respect to all zoning and development approvals necessary and appropriate to achieve and an overall success at the Resort."

[41]  Unit Owner meetings on the Settlement Agreement were held on October 16 and November 18 and 20, 2013.

[42]  In contrast, the special assessment required to pay a $23 million judgment in AP 567, if it becomes final, would be about $105,000 per unit.

counted his 59 proxies as "aye" votes, resulting in a vote of 206 to 3 for approval of the obligations required by the Settlement Agreement.[43]

Transfer of Assets

The Plan provides for the transfer of all of the Rec. Lease Property to the "appropriate designated party pursuant to Sections 105, 363 and 1123(a)(5) of the Bankruptcy Code *free and clear of any and all liens, claims, encumbrances and interests of any kind except as otherwise expressly stated in this Plan*."[44]  No buyer or price is stated.  The Settlement Agreement would require the Klauber Entity debtors to transfer to the Association all of their assets, including the Rec. Lease Property, Unit 501, and Condominium Accessory Units A-G.

Payment by the Association

In consideration for the interdependent transactions, the Association will pay cash and deliver notes, payable from special assessments of the Unit Owners, as follows:

      (a)     a $300,000 note to be delivered to the Klauber Entity debtors, payable over 5 years at 6% interest;

      (b)     in full settlement of AP 568 and the Rejection Damages Claims, a $500,000 note to be delivered to the Rec. Lease Property owners, payable over 5 years at 6% interest, with an option to pay $450,000 cash on the Closing Date;

      (c)     in full settlement of AP 567, a $2.3 million note to be delivered to the Partnership trustee, payable over 5 years, at 6% interest, with an option to pay $2,070,000 cash on the Closing Date; and

      (d)     a $2,950,000 consulting agreement with the Klauber Family and Colony Investors, Inc. (parent of debtor CBI), requiring a $500,000 payment on the Closing Date and $2,450,000 payable over 5 years, at 6% interest beginning not  later than six months after the Closing Date.

---

[43]  Approximately 171 votes are needed to approve special assessments.

[44]  Section 8.2 (*emphasis added*).

Attached to the Settlement Agreement are schedules which list the claims to be paid in in the Chapter 11 cases and the Partnership Chapter 7. The overall effects of the Joint Plan and Settlement Agreement can be summarized, as follows:

1.    In the Partnership Chapter 7:  the claims of Unit Owners and the Association (about $26 million) will be subordinated (Schedule 3); administrative expenses and priority claims will be paid in full (Schedule 2); any remaining funds received from the Association's payments will be available for *pro rata* distribution to general unsecured creditors now holding $1,247,837 in claims (Schedule 3). No funds will be paid to (or reserved for) Colony Lender, whose secured claim is being contested in AP 196, and which is to be "channeled" to payment by the Association (or a designee) for release of the mortgagee interest following termination of the condominium.

2.    In the Klauber Entities Chapter 11 cases:  the $400,000 to be received from the Association, for the combined 80% interest in the Rec. Lease Property, will be paid to:  the Icard Merrill law firm and other priority claimants per Schedule 7; and $100,000 to First Federal Bank of Florida, which holds a judgment lien; the Association's $15 million of claims will be subordinated; any balance will be paid *pro rata* to the holders of general unsecured claims of about $1.1 million (Schedule 8); the holders of priority tax claims for 2010-2012 estimated at $402,862 are to be paid over five years, or in a lump sum, by the next "transferee" of the property (Schedule 6).

3.    The Joint Plan (Section 6.1) provides that Colony Lender will be paid, within one year, either a mutually agreed sum or the judicially determined "fair and reasonable" value, in accordance with a plan of termination of the condominium under Section 718.117, Florida Statutes, of the proportionate value of the Rec. Lease Property; if not so paid within one year, the real estate will be "surrendered" or conveyed to Colony Lender.

4.    Reduced judgments will be entered in AP 567 ($2.3 million) and AP 568 ($500,000) and all of the settling parties' disputes in the Association and Partnership cases and the state court foreclosure of Dr. Klauber's units will be deemed resolved, with mutual general releases given.

5.    The Settlement Agreement is conditioned on entry by this Court of orders barring and enjoining "any creditor of any Party from asserting any claim, defense or right against a Party on, under, relating in any way to, or in connection with the Colony Disputes  . . . ." The claim of "any creditor of any Party related to the Colony Disputes would be "channeled" by an injunction so that the only remedy is to receive distribution as provided in the Joint Plan and Settlement Agreement.

20

The Joint Plan includes broad provisions (Article 7) to discharge and release claims by creditors against the debtors RMI, CBTC and CBI, as well as claims against non-debtors, namely the Parties to the Settlement Agreement.[45]

At the conclusion of the third day of hearings, on December 3, 2013, debtors' counsel announced that the Joint Plan and Settlement Agreement needed to be amended to:  (1) extend the Closing Date to the end of March, 2014; (2) provide for a separate $75,000 payment to the Field Trust for its Rejection Damages Claim; (3) provide for the acquisition of BreakPointe's 5% interest in the Rec. Lease Property and designate BreakPointe as an additional Released Party; (4) add CBI's Units C and E to Colony Lender's mortgage lien; and (5) provide for escrow of a deed to Colony Lender (for the 35%, 45% and 15% undivided interests in the Rec. Lease Property) for delivery in the event of a default (i.e., no payment within a year).  At the continued hearing on January 27, 2014, counsel for the Association and BreakPointe advised the Court that the amendments were still being negotiated.  As of February 26, 2014, the amendment had not been filed.

Section 1111(b) Election

On December 13, 2013, Colony Lender filed a "Section 1111(b) election" effectively choosing not to participate as an unsecured creditor to the extent of any deficiency between its claim amount and the value of its collateral.[46]  The debtors filed a motion to strike the election on two grounds:  (a) it was not timely filed and (b) the 1111(b)(2) election is not permitted when the collateral is to be sold "in connection with the termination of the Colony Condominium."[47]

---

[45]  Subparagraph 1(o).  "Party" includes the Association and its present and former members, officers, directors and attorneys.  Dr. Klauber is also a Party.  The "Colony Disputes" include AP 567, AP 568 and the Rejection Damages Claims.

[46]  Chapter 11 Case, Doc. No. 232.

[47]  Chapter 11 Case, Doc. No. 236.

The Court will not strike Colony Lender's Section 1111(b)(2) election.  The deadline set by this Court's order (Chapter 11 Case, Doc. No. 176) was the conclusion of the confirmation hearing.  Evidence was taken on November 22 and 25 and December 3, 2013.  At the conclusion of the December 3 hearing, the Court requested briefs by December 23, 2013, and continued the confirmation hearing to January 27, 2014, for consideration of the post-trial briefs and other matters.  Colony Lender made the election before the post-trial briefs were due, and while the debtors' proposed amendments to the Joint Plan were outstanding.  Thus, the election was made timely.  The debtors carefully avoid saying that the proposed transfer to the Association is a "sale."  The Section 1111(b)(2) election may now be moot, however, given the ruling on confirmation below, but Colony Lender's election will not be stricken.

<u>Confirmation Standards</u>

Generally, a bankruptcy court may confirm a Chapter 11 plan only if each class of creditors that is affected by the plan consents.  *See* 11 U.S.C. § 1129(a)(8).  Bankruptcy Code Section 1129(b) creates an exception to that general rule, permitting confirmation of a nonconsensual plan – commonly known as a "cramdown" plan – if "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."

Bankruptcy Code Section 1129(b)(2)(A) establishes three criteria for determining whether a cramdown plan is "fair and equitable" with respect to the holder of a secured claim, like Colony Lender:  under <u>clause (i)</u>, the secured creditor retains its lien on the property and receives deferred cash payments with a present value at least equal to the collateral's value; under <u>clause (ii)</u>, the property is sold free and clear of the lien, "subject to section 363(k)," and

the creditor receives a lien on the proceeds of the sale;[48] and under <u>clause (iii)</u>, the creditor will realize the "indubitable equivalent" of its secured claim.

The Court has given serious consideration to the justifications for confirmation offered by the Klauber Entity debtors and the settling parties:  (1) redevelopment of the Resort cannot be achieved until ownership of the entire 18 acres is consolidated and all litigation is concluded; (2) Section 363(h) of the Bankruptcy Code expressly authorizes a forced sale of the non-debtors' interests in the Rec. Lease Properties and the debtors have established each of the three applicable requirements for a Section 363(h) sale;[49] (3) ultimately, the price to be paid to Colony Lender for the 80% and 15% interests in the Rec. Lease Property interests will have to be "fair and reasonable" under §718.117, Florida Statutes; (4) it is not inequitable for Colony Lender to wait for up to a year to more than double its return on the discounted purchase of the Bank of America loans; (5) in the event that a third-party funding source does not become available within a year, the 95% interests in the Rec. Lease Property will be reconveyed to Colony Lender as the "indubitable equivalent" of its secured claim; (6) the future support by, and payments to, Dr. Klauber and Ms. Moulton are essential to dealing with the Town of Longboat Key on zoning and permitting issues; and (7) the alternative to the proposed land consolidation and settlements is more litigation and delay for all parties.[50]

---

[48]  Section 363(k) provides that "unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property" – *i.e.*, the creditor may credit-bid at the sale, up to the amount of its claim.

[49]  The record supports the conclusion that the property cannot be partitioned and that a sale of 100% of these strategic 3 acres will produce a higher value than sale of any of the three separate undivided interests alone. Compare the higher appraised value of 80% of the entire Rec. Lease Property to the sales prices for the 15% and 5% interests that were traded in 2011.

[50]  The parties have represented to the Court that further delay may prompt the Town of Longboat Key to reduce the permitted density of the Resort property.

These justifications are plausible and have some support in the record, but they are insufficient to overcome the sufficient reasons to deny confirmation of the Joint Plan. Colony Lender holds a $14 million foreclosure judgment. The Joint Plan would cause a transfer (sale) to the Association of Colony Lender's collateral, CBTC's and CBI's 80% interest in the Rec. Lease Property, and of Colony Lender's 15% interest, with the price unstated and payment deferred until after Unit Owners approve a plan of termination of the condominium, a judicial valuation proceeding is concluded, and a funding source obtained. The Joint Plan provides that the conveyance to the Association will be "free and clear" of all liens, except as expressly stated in the Joint Plan. But, the treatment of Colony Lender's mortgage (Section 6.1) includes no such exception.[51] Neither the value to be paid for the transfer, nor the ultimate source of funds is presently known.[52]

The proponents urge the Court to confirm the Joint Plan on a ruling that it provides Colony Lender with the "indubitable equivalent" of its secured claim because ultimately Colony Lender will be paid or will receive its collateral back. Depending on the specific facts, the deferred surrender of collateral to the creditor may provide the "indubitable equivalent" of the secured claim, which would justify such treatment over the creditor's objection.[53] A plan that calls for deferred payment or return of the collateral within a specified time, for example where there is a demonstrable equity cushion in excess of the secured claim, may satisfy the indubitable

---

[51] In fact, Section 6.1 of the Plan omits even the boilerplate phrase usually found in plans, as required by 11 U.S.C. §1129(6)(2)(A)(i), that the "creditor will retain the liens securing [its] claims." The Joint Plan's proponents represented to the Court that the transfer of real estate to the Association would be "subject" to Colony Lender's mortgage, but that is not specified in the Joint Plan.

[52] The Joint Plan and Settlement Agreement provide only $400,000 in immediate payment to the debtors to pay administrative and other claims and the promise of five years' funding from the Association to pay priority tax claims.

[53] *Sandy Ridge Development Corp. v. Louisiana National Bank*, 881 F.2d 1346, 1350 (5th Cir. 1989).

equivalent requirement of clause iii.[54]  But, if there is no compensation for the risks arising from the delay, a deferred surrender of collateral would not provide "indubitable equivalence."[55]

There is no equity cushion here to protect Colony Lender during the deferral period. And, there is no proposed payment to compensate it for the one-year wait for the surrender of its collateral.  The proposed treatment does not specify a value to be paid to Colony Lender, a time for such value to be paid, a time for determining the value to be paid, a method of payment of the value determined at some point in the future, or any interim payments to insure that the present value of the Rec. Lease Property is preserved.  Real estate taxes will continue to accrue on the property and there are risks inherent to having the Association or a subsequent designee speculate in the use and zoning of the collateral before its reconveyance on default.[56]

The Joint Plan, however, proposes more than a deferral of payment or surrender of the property.  It would result in a transfer (sale) of the real estate to the Association.  The debtors acknowledge that their assets are to be sold in their motion to strike Colony Lender's Section 1111(b) election.

In 2012, the Supreme Court ruled that a Chapter 11 plan that calls for the sale of a secured creditor's property, "free and clear," cannot be confirmed over the creditor's objection under the general standard of indubitable equivalence, but must satisfy the more specific

---

[54]  *See Travelers Ins. v. Pikes Peak Water Co.*, 779 F.2d 1456 (10th Cir. 1985).

[55]  *See In re Murel Holding Co.*, 75 F.2d 941 (2d Cir. 1935) (plan calling for interest only payments for 10 years, with a balloon and no provision for maintenance of property does not provide indubitable equivalence).

[56]  The Court is not impressed, however, with Colony Lender's protests that its collateral is physically deteriorating without maintenance.  The Rec. Lease Property consists of tennis courts, a swimming pool and ancillary buildings. When Colony Lender bought Bank of America's claim in 2010, the Resort was operating only a fraction of the guest units amidst well-known physical deterioration.

requirement of clause (ii) and the mandatory right to allow the mortgagee to credit-bid.[57]  The ability to credit-bid helps to protects a secured creditor against the risk that its collateral will be sold at a depressed price.  It enables the creditor to purchase the collateral for what it considers the fair market price (up to the amount of its security interest) without committing additional cash to protect the loan.  The Joint Plan cannot be confirmed because it fails to meet this mandatory cramdown requirement.

Finally, the Joint Plan is vague with respect to the terms of the Section 363(h) transfer of the 15% of the Rec. Lease Property that Colony Lender now owns.  There is no provision to value that interest, no time for the acquisition to occur or how payment is to be made and no opportunity for Colony Lender to match the price, as required by 11 U.S.C. § 363(i).

The release and discharge provisions of the Joint Plan raise serious questions, as well.  Under Article 7 of the Joint Plan, the Released Parties under the Settlement Agreement (see definition of "Parties" on page 8 of the Settlement Agreement) will be discharged and released from all claims and causes of action by "all Holders of Claims" and the discharge will be enforced by an injunction.  Among other things, the scope of the discharge, release and channeling injunction is any claim "based upon any act, omission, document, instrument, transaction or any other activity . . . that occurs in connection with implementation of the . . . Plan."[58]

---

[57] *Radlax Gateway Hotel, LLC. v. Amalgamated Bank*, ___ U.S. ___, 132 S.Ct. 2065 (2012).  The debtor proposed a sale of its property at auction, free and clear of the bank's liens, with a payment to the bank of the sale proceeds, without permitting the bank to credit-bid at the auction.  The Supreme Court rejected the debtor's argument that bank, would be realizing the "indubitable equivalent" of its secured claim.  *Id.* at 2070.  The Court concluded instead, that the more specific requirement of clause (ii) – allowing the secured creditor to credit-bid – applies whenever a plan calls for selling collateral free and clear of liens.  *Id* at 2071.

[58]  Article 7.1.

Although Paragraph 12 of the Settlement Agreement provides for a "carve out" of sorts, it does not cover matters in the Joint Plan:

> "Nothing *in this Agreement* (including, without limitation, the releases and the covenants not to sue set for the in Section 11 of this Agreement) is intended, and nothing herein or therein shall be construed, to release or discharge any right or claim against any person or entity other than the Association, the Partnership, the Trustee, and the Klauber Parties with *respect to the matters covered by this Agreement.*" (*emphasis added*)

In the future, reasonable people -- and courts -- may conclude that the discharge and release provisions in the Joint Plan and the anticipated court-ordered injunction would operate to release: (a) Dr. Klauber and Colony Investors, Inc., from their guarantees of obligations to Colony Lender; and (b) Unit Owners from obligations (if there are any) to the owners of the Rec. Lease Property under Article 4.4 of the Declaration. Such effects are likely beyond the jurisdiction of this Court and are not fair and equitable.[59]

Colony Lender's other objections to the Joint Plan, however, are not decisive.

1.      This is not, as Colony Lender contends, an impermissible "substantive consolidation," which has not been considered on a proper motion and hearing. Substantive consolidation is a merger of the assets and liabilities of two or more related bankruptcy estates (whose finances are hopelessly entangled). Such mergers require special scrutiny to ensure that the *unsecured* creditors of a higher-value estate would not be unfairly diluted by the merger with a lower-value estate. Colony Lender is a secured creditor to which specific protections apply, as discussed above. Moreover, the merits of the Joint Plan and Settlement Agreement were fully heard on due notice.

2.      The disclosure statement does provide adequate and sufficient information to enable each class of creditors to make an informed judgment about the plan. Colony Lender knows nearly as much about the debtors, their assets, and the pending disputes as anyone. It is doubtful whether additional information would have caused Colony Lender to change its vote. Section 105(d)(2)(B) expressly permits the hearing on approval of

---

[59] *See In re Munford, Inc.,* 97 F.3d 449, 455 (11th Cir. 1996).

the disclosure statement to be combined with the hearing on confirmation of a Chapter 11 plan.

3.     Colony Lender's protests about the propriety of the Association's governance and Unit Owners' voting (regarding approval of the Settlement Agreement, approval of post-confirmation transactions) are not relevant.  Even though the technical pre-requisites of Association action make it an unwieldy funding source, the Joint Plan is drafted around that contingency by providing for the conveyance of property back to Colony Lender if all conditions subsequent are not completed within a year.  The Unit Owners could certainly ratify any prior action, if necessary to close the transaction.

Settlement Agreement

In deciding whether to approve or disapprove a proposed settlement, this Court must consider the four factors set forth by the Eleventh Circuit in *In re Justice Oaks II, Ltd.*[60]

(a)  The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; [and] (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

A settlement agreement may be approved so long as it does not "fall below the lowest point in the range of reasonableness."[61]

Here, the Settlement Agreement does not satisfy the *Justice Oaks* requirements.  Although the Settlement Agreement would resolve complex and expensive litigation, it is premised on an overbroad and inequitable channeling injunction and claims bar against Colony Lender, as discussed above.  The Settlement Agreement makes no provision or reserve for Colony Lender having a security interest in property of the Partnership's estate, particularly any recovery in, or payment to settle, AP 567.  Finally, the Settlement Agreement is conditioned on

[60]  898 F.2d 1544, 1549 (11th Cir. 1990).

[61]  *In re Martin*, 490 F.3d 1272, 1275 (11th Cir. 2007).

confirmation of the Joint Plan, which will not occur.  Thus, the Settlement Agreement cannot be implemented and approval must be denied.

<u>CONCLUSION</u>

The Joint Plan and Settlement Agreement seek the understandable goals of consolidating ownership of the entire 18 acres of the Colony Resort in the Association to facilitate a sale and ending more than seven years of complex and costly litigation.  Even though Colony Lender has been characterized in the negative as a "claims buyer," it is legally entitled to seek recovery of the nearly $14 million that was awarded in state court.  The Joint Plan's proposal that Colony Lender's collateral would be sold to the Association, "free and clear" of the lien, but without complying with the mandatory credit-bid requirement of Section 1129(b)(2)(A)(ii), prohibits confirmation over Colony Lender's objection.  In addition, the forced sale of Colony Lender's 15% interest, without provision for payment or a Section 363(i) buy-out, is  not permitted.  The overbroad "release and discharge" and channeling provisions, proposed by the Joint Plan and Settlement Agreement are not "fair and equitable."  For these reasons, the Joint Plan cannot be confirmed.  The Settlement Agreement cannot be approved either, because it is dependent on confirmation of the Joint Plan and makes no reserve for Colony Lender's security interest in Partnership assets.

ACCORDINGLY, by separate orders,

1.      the debtors' motion to strike Colony Lender's Section 1111(b) election will be denied;

2.      confirmation of the Joint Plan will be denied;

3.      the Chapter 11 cases of RMI, CBTC and CBI will be converted to Chapter 7;

4.      the motions to approve the Settlement Agreement, filed in the Association, Partnership and Klauber Entities cases will be denied;

5.      Colony Lender's motion for relief from stay in the Klauber entities cases (Chapter 11 Case, Doc. No. 249) will be granted, for the reasons stated on the record in open Court on February 26, 2014;

6.      Colony Lender's motion for permission to file an interlocutory appeal (Chapter 11 Case, Doc. No. 234) from this Court's order reinstating the automatic stay (Chapter 11 Case, Doc. No. 225), will be denied as moot and, with Colony Lender's consent, the Notice of Appeal from that order (Doc. No. 235) will be stricken; and

6.      in AP 196, partial summary judgment will be entered, in part, for the Association and for Colony Lender.

**DONE** and **ORDERED** in Chambers at Tampa, Florida, on <u>March 21, 2014</u>.


_____
K. Rodney May
United States Bankruptcy Judge


Copies to be provided by CM/ECF service.